# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Roanoke Division

| | |
|---|---|
| EUNIEKA SIMS | ) |
|     Plaintiff, | ) <br> )    Case No. 7:20cv646 |
| v. | ) <br> ) **JURY TRIAL DEMAND** |
| PIEDMONT FOUNDRY SUPPLY, INC. | ) |
|     SERVE: Robert D. Birmingham <br>            Registered Agent <br>            P.O. Box 87 <br>            Cloverdale, Virginia 24077 | ) |
|     Defendant. | ) |

## COMPLAINT

Plaintiff Eunieka Sims, by counsel, moves this Court enter judgment in her favor against Piedmont Foundry Supply, Inc. ("Defendant"), and in support of such complaint alleges as follows:

## NATURE OF ACTION

1. This action brings federal claims of discrimination and retaliation based on sex under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.* Plaintiff brings these claims because Defendant discriminated against her due to her sex and retaliated against her for engaging in protected activity. Plaintiff was ultimately terminated from her employment as a result of Defendant's actions.

## JURISDICTION AND VENUE

2. This Court has federal question jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is a civil action arising under a federal statute.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events described in this action took place within this judicial district.

## PARTIES AND RELEVANT NON-PARTIES

4. Plaintiff Eunieka Sims ("Plaintiff" or "Ms. Sims") is a resident and citizen of Virginia.

5. Ms. Sims is a woman and, as such, is a member of a protected class based on her sex.

6. Defendant Piedmont Foundry Supply ("Piedmont") is a Virginia company with its principal place of business in Cloverdale, Virginia.

7. Robert Birmingham ("Birmingham") was, at all times relevant to this Complaint, the President of Piedmont.

## FACTS

### *Ms. Sims' Responsibilities and Complaints of Sex Discrimination*

8. Piedmont is a foundry supplier and manufacturer of pre-cast refractory shapes, sand molds, and cores.

9. Piedmont has both warehouse and manufacturing facilities.

10. Ms. Sims became an employee of Piedmont on or about June 30, 2017.

11. She was hired as a laborer to work in the core-making shop, part of the manufacturing facility.

12. She had no specific job description, but as an employee in the core-making shop, assisted in the production and manufacture of pre-cast cores.

13. In order to make cores, as required, she needed sand as a raw material.

14. Moving sand to Ms. Sims' work station required use of a forklift.

15. Despite her requests, Piedmont never trained Ms. Sims to use the forklift.

16. As a result, every time she needed sand, she had to ask a forklift-trained employee to get it for her.

17. She was the only individual in the core making shop that was not permitted to use the forklift.

18. There were four other non-supervisory employees in the core making shop while Ms. Sims was employed there, and all were men.

19. All of the men in the core-making shop were permitted to use the forklift.

20. All of the men in the core-making shop, except Chuck Wendling ("Wendling"), received forklift training from Piedmont.

21. Piedmont permitted Wendling to operate the forklift based on training he received prior to his employment at Piedmont.

22. Because Ms. Sims needed to wait for other employees to bring her sand, her productivity was lower than the other shop employees.

23. On information and belief, Piedmont awarded bonuses based on employee productivity.

24. Had Ms. Sims been trained to use the forklift, she would have received higher bonuses.

25. Ms. Sims complained in person to Mike Bishop ("Bishop"), the core-making shop foreman, on approximately five occasions in 2018 about her lower production levels and concerns that she was not being trained because she was a woman.

26. Ms. Sims complained to Birmingham in person on approximately three occasions in 2018 about her lower production levels and concerns that she was not being trained because she was a woman.

27. On each occasion that Ms. Sims complained, she was told that one of the guys could get sand for her and that she did not need to drive the forklift.

28. She was instructed to "find something to clean" until one of them men could deliver sand to her.

29. On September 26, 2018, Ms. Sims again complained to Birmingham and Bishop in a joint in-person meeting that she was being discriminated against by Piedmont's refusal to train her on the forklift.

30. Birmingham and Bishop responded that she was hired to make cores, not to drive the forklift.

31. Ms. Sims felt dismissed and discouraged by Piedmont's refusal to address her concerns that she was being discriminated against.

*Ms. Sims' Termination from Piedmont*

32. In October 2018, Ms. Sims took over caretaking responsibilities for her granddaughter and, as a result, sought occasional leave to help get her granddaughter situated at a new school and arrange for childcare.

33. Piedmont has no specific policy for taking leave, but as Ms. Sims' supervisor, Bishop was responsible for approving her leave.

34. Ms. Sims spoke to Bishop about her need to care for her granddaughter and asked permission to leave early on October 31, 2018.

35. Bishop granted Ms. Sims permission to leave early on that date.

36. As Ms. Sims was leaving, Birmingham confronted Ms. Sims in the parking lot.

37. Birmingham told her that he expected her to work 40 hours per week and if she left, she should not return to work.

38. Ms. Sims reminded him that she had recently taken over caretaking duties of her granddaughter, that she had received permission to leave, and that she had childcare set up the following day.

39. Birmingham terminated her employment, telling her to leave and not return.

40. Prior to her termination, Ms. Sims had been performing her work well.

41. On information and belief, Defendant sought to retaliate against Ms. Sims' due to her continued complaints about discrimination.

42. Piedmont claimed Ms. Sims was "voluntarily terminated" as a result of not appearing for work or calling in an absence on November 1 or 2, 2018.

43. Ms. Sims did not appear for work *only because* Birmingham had already terminated her employment.

44. On information and belief, Defendant's reasoning was a cover for its unlawful actions, and Ms. Sims would not have been terminated but for her complaints that she was being discriminated against.

45. On May 7, 2019, Ms. Sims filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination and retaliation.

46. The EEOC issued a Notice of Right to Sue on Ms. Sims' charge on August 5, 2020.

47. All conditions precedent to the institution of this lawsuit have been fulfilled.

48. Plaintiff has exhausted her administrative remedies as required by 42 U.S.C. § 2000e, *et seq*.

49. This matter is timely filed within ninety (90) days of Plaintiff's receipt of her Notice of Right to Sue.

## COUNT I
## SEX DISCRIMINATION IN VIOLATION OF TITLE VII
## 42 U.S.C. § 2000e

50. The allegations in the foregoing paragraphs are incorporated as if realleged herein.

51. Plaintiff is a member of a protected class based on her sex.

52. Piedmont subjected Plaintiff to discrimination based on her sex in violation of the provisions of Title VII.

53. Ms. Sims complained to Piedmont on multiple occasions of the discrimination described above, and Piedmont failed to promptly or thoroughly address Ms. Sims' complaints.

54. Piedmont ignored each of Ms. Sims' complaints of sex-based discrimination.

55. Ms. Sims' pay and status as an employee were adversely affected as a result of the sex discrimination she suffered.

56. As a direct and proximate result of the willful, knowing, and intentional discrimination against Plaintiff, and the failure to act by Defendant, Plaintiff has suffered emotional and mental distress, anguish, and indignation. Plaintiff is thereby entitled to general and compensatory damages in an amount to be proven at trial.

57. As a direct and proximate result of the acts and conduct of Piedmont as alleged herein, Plaintiff has suffered loss of earnings and related employment benefits in an amount to be proven at trial.

58. Piedmont's acts alleged herein were malicious, oppressive, and in conscious disregard of Plaintiff's rights. As such, punitive damages are warranted against Piedmont.

## COUNT II
## RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY
## IN VIOLATION OF TITLE VII
## 42 U.S.C. § 2000e

59. The allegations in the foregoing paragraphs are incorporated as if realleged herein.

60. Title VII prohibits retaliation for engaging in a protected activity; specifically, in pertinent part, Title VII reads, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of her employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

61. Ms. Sims engaged in protected activity when she made complaints to Bishop and Birmingham that Piedmont's failure to give her forklift training was the result of discrimination.

62. Piedmont was aware of the protected activity in which Ms. Sims engaged.

63. Piedmont retaliated against Ms. Sims for engaging in protected activity by terminating her employment.

64. These actions are retaliation prohibited by the anti-retaliation provisions of Title VII.

65. Defendant's conduct was actuated by malice, spite, and ill will; was willful and wanton, and evinced conscious disregard for the rights of Ms. Sims.

66. As a direct and proximate result of Defendant's actions, Ms. Sims has suffered and continues to suffer severe emotional distress. Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, anxiety, distress, depression, anxiety, fearfulness, difficulty sleeping, loss of enjoyment of life, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, litigation expenses including attorneys' fees, and other non-pecuniary losses.

67. Due to the severity of Defendant's conduct, Ms. Sims is also entitled to punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Sims requests this Court enter judgment in her favor against Defendant and further:

(a) Award Ms. Sims compensatory damages, plus past and future pecuniary damages on each of the above-stated Counts in an amount that can only be determined in discovery; and in addition

(b) Award Ms. Sims punitive damages as to all Counts in an amount this Court deems appropriate; and in addition

(c) Award Ms. Sims attorneys' fees, expert fees, and costs of this action as may be permitted by law; and in addition

(d) Award Ms. Sims such other and further relief as may be appropriate.

## JURY DEMAND

**PLAINTIFF EUNIEKA SIMS DEMANDS A TRIAL BY JURY.**

Dated:   November 3, 2020                    Respectfully,

                                                          /s/
Joshua Erlich, VA Bar No. 81298
Davia Craumer, VA Bar No. 87426
Katherine L. Herrmann, VA Bar No. 83203
THE ERLICH LAW OFFICE, PLLC
2111 Wilson Blvd., Ste. 700
Arlington, VA  22201
Tel:   (703) 791-9087
Fax:   (703) 722-8114
Email: jerlich@erlichlawoffice.com
       dcraumer@erlichlawoffice.com
       kherrmann@erlichlawoffice.com